# IN THE UNITED STATES DISTRICT COURT FOR THE
# NORTHERN DISTRICT OF ALABAMA
# JASPER DIVISION

| | |
|---|---|
| **TAMMY E. LACY**, | ) |
| | ) |
| **Plaintiff** | ) |
| | ) |
| v. | )    **CV-11-BE-0360-J** |
| | ) |
| **MICHAEL J. ASTRUE**, | ) |
| **Commissioner of the Social** | ) |
| **Security Administration** | ) |
| | ) |
| **Defendant.** | ) |

## MEMORANDUM OPINION

### I. INTRODUCTION

On January 9, 2008, the claimant, Tammy E. Lacy, applied for supplemental security income under Title XVI of the Social Security Act. (R. 93-98). The claimant alleges disability commencing on December 20, 2007, because of chronic pain related to a spinal abscess. (R. 117). The Commissioner denied the claim both initially and on reconsideration. (R. 66-70). The claimant filed a timely request for a hearing before an Administrative Law Judge, and the ALJ held a hearing on December 2, 2009. (R. 21-63, 74-75, 84-88). In a decision dated February 11, 2010, the ALJ found that the claimant was not disabled as defined by the Social Security Act and thus was ineligible for supplemental security income. (R. 6-16). On December 13, 2010, the Appeals Council denied the claimant's request for review; consequently, the ALJ's decision became the final decision of the Commissioner of the Social Security Administration. (R. 1-3). The claimant has exhausted her administrative remedies, and this court has jurisdiction pursuant to 42 U.S.C. §§ 405(g) and 1631(c)(3). For the reasons stated below, this court affirms the decision of the Commissioner.

1

## II.  ISSUE PRESENTED

The claimant presents one issue:  Whether the ALJ failed to give sufficient weight to the opinion of the claimant's treating physician, Dr. Felix Morris, in applying the Eleventh Circuit's three-part pain standard.

## III. STANDARD OF REVIEW

The standard of review of the Commissioner's decision is a limited one.  This court must find the Commissioner's decision conclusive if it is supported by substantial evidence. 42 U.S.C. § 405(g); *Graham v. Apfel*, 129 F.3d 1420, 1422 (11th Cir. 1997).  "Substantial evidence is more than a scintilla, but less than a preponderance.  It is such relevant evidence as a reasonable person would accept as adequate to support a conclusion." *Richardson v. Perales*, 401 U.S. 389, 401 (1971).  A reviewing court may not look only to those parts of the record which support the decision of the ALJ, but instead must view the record in its entirety and take account of evidence that detracts from the evidence relied on by the ALJ. *Hillsman v. Bowen*, 804 F.2d 1179 (11th Cir. 1986).  As the Eleventh Circuit has counseled,

> [The court must] . . . scrutinize the record in its entirety to determine the reasonableness of the [Commissioner's] . . . factual findings . . . No similar presumption of validity attaches to the [Commissioner's] . . . legal conclusions, including determination of the proper standards to be applied in evaluating claims.

*Walker v. Bowen*, 826 F.2d 996, 999 (11th Cir. 1987).

## IV. LEGAL STANDARD

Under 42 U.S.C. § 423(d)(1)(A), a person is entitled to disability benefits when the person is unable to

> engage in any substantial gainful activity by reason of any medically determinable

physical or mental impairment[1] which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months . . . .

To make this determination the Commissioner employs a five-step, sequential evaluation process. *See* 20 C.F.R. §§ 404.1520, 416.920.

(1) Is the person presently unemployed?
(2) Is the person's impairment severe?
(3) Does the person's impairment meet or equal one of the specific impairments set forth in 20 C.F.R. Pt. 404, Subpt. P, App. 1?
(4) Is the person unable to perform his or her former occupation?
(5) Is the person unable to perform any other work within the economy?

An affirmative answer to any of the above questions leads either to the next question, or, on steps three and five, to a finding of disability. A negative answer to any question, other than step three, leads to a determination of "not disabled."

*McDaniel v. Bowen*, 800 F.2d 1026, 1030 (11th Cir. 1986).[2] To establish disability, the claimant has the burden of proving the first three steps, namely that (1) she is not engaged in substantial gainful activity, (2) she has a severe impairment or combination of impairments, and (3) her impairment or impairments meet or exceed the criteria in the Listings found in 20 C.F.R. Pt. 404, Subpt. P, App. 1. If the claimant cannot prove that she has a listed impairment, she must prove alternatively that she is unable to perform her previous work. *Jones v. Apfel*, 190 F.3d 1224, 1228 (11th Cir. 1999); *see also Lucas v. Sullivan*, 918 F.2d 1567, 1571 (11th Cir. 1990). Once the claimant shows that she cannot perform her previous work, the burden shifts to the Commissioner "to show the existence of

---

[1]A "physical or mental impairment" is one resulting from anatomical, physiological, or psychological abnormalities that are demonstrable by medically acceptable clinical and laboratory diagnostic techniques.

[2]*McDaniel v. Bowen*, 800 F.2d 1026 (11th Cir. 1986) was a supplemental security income case under Title II. The same sequence applies to disability insurance benefits under Title XVI. Cases arising under Title II are appropriately cited as authority in Title XVI cases. *See e.g. Ware v. Schweiker*, 651 F.2d 408 (5th Cir. 1981) (Unit A).

other jobs in the national economy which, given the claimant's impairments, the claimant can perform." *Jones v. Apfel*, 190 F.3d at 1228.

Because the claimant alleges that one of her disabling conditions is pain**,** the ALJ must apply the Eleventh Circuit pain standard to determine whether the claimant is disabled by pain. *See Holt v. Sullivan*, 921 F.2d 1221, 1223 (11th Cir. 1991). The pain standard requires:

> (1) evidence of an underlying medical condition *and either*
> (2) objective medical evidence that confirms the severity of the alleged pain arising from that condition; *or*,
> (3) that the objectively determined medical condition is of such a severity that it can be reasonably expected to give rise to the alleged pain.

*Id.* (emphasis added). While a reversal is warranted if the ALJ's decision contains no evidence of the proper application of the three-part pain standard, the ALJ does not have to recite the pain standard word-for-word. *Id*. Instead, the ALJ may make findings that indicate that the standard was applied. *Id.*

In applying the pain standard, the ALJ must give considerable weight to a treating physician's opinion. *See Crawford v. Comm`r*, 363 F.3d 1155, 1159 (11th Cir. 2004); *Lewis v. Callahan*, 125 F.3d 1436, 1440 (11th Cir. 1997). However, "the [ALJ] may reject any medical opinion," including a treating physician's, "if the evidence supports a contrary finding," *Sryock v. Heckler*, 764 F.2d 834, 835 (11th Cir. 1985). If the evidence supports such a contrary finding, the ALJ must articulate specific reasons for rejecting the treating physician's opinion. *See Moore v. Barnhart*, 405 F.3d 1208, 1212 (11th Cir. 2005).

### V.  FACTS

The claimant has a high school education and was forty-six years old at the time of the administrative hearing. (R. 23, 93, 155). Her previous work experience includes employment as a

waitress, a mobile home escort driver, a mobile home service technician, and a delivery driver for Federal Express. (R. 25-31, 100-102, 109-115, 146). The claimant originally alleged she was unable to work because of chronic pain resulting from a spinal abscess. (R. 117). During the administrative hearing, however, the claimant testified that she suffered debilitating pain associated with fibromyalgia, as well as depression and anxiety. (R. 31-46). According to the claimant, her pain and related problems began after a four-wheeler accident in 2006. (R. 31-32, 523).

*Physical Limitations*

The claimant purports to have suffered a violent four-wheeler accident in 2006. (R. 31-32, 523, 543-45). On July 1, 2007, the claimant presented to the emergency room at Eliza Coffee Memorial Hospital, and Dr. Eniola Otuseso admitted the claimant for treatment of a paraspinal abscess. (R. 182-83, 186-87). On July 3, 2007, the claimant underwent surgery to relieve and drain the abscess. (R. 176). Following surgery, the claimant experienced pulmonary infiltrates, and Dr. Otuseso requested a pulmonary consultation from Dr. Felix Morris, a pulmonary specialist. (R. 186). Dr. Morris met with the claimant for first time on July 5, 2007. *Id.* In his report on this visit, Dr. Morris noted Methicillin-resistant Staphylococcus aureus (MRSA) sepsis consistent with acute respiratory distress syndrome (ARDS), and he prescribed Vancomycin, Cleocin, and Levaquin, as well as an oxygen treatment. *Id.* By July 11, 2007, the claimant's blood cultures returned negative for infection. (R. 190). Throughout late July 2007, a series of MRIs, ultrasounds, and x-rays revealed marked improvement in the claimant's paraspinal abscess and pulmonary infiltrates. (R. 255-89). Physicians noted growing concern, however, regarding new bone edema in the T10 and T11 vertebral bodies, adjacent to the claimant's previous abscess. (R. 280-81).

The claimant remained hospitalized until August 27, 2007. (R. 172). During this extended

5

stay, the claimant met with multiple specialists regarding a variety of symptoms. (R. 190). On August 4, 2007, Dr. Gerard Haggstrom, a gastrointestinal specialist, consulted the claimant following complaints of severe abdominal pain. Dr. Haggstrom noted a previously diagnosed ulcer but identified no alarming symptoms such as bleeding, fever, chills, or jaundice. Dr. Haggstrom recommended against removing the claimant's gallbladder because of a risk of persistent symptoms. (R. 184, 190). On August 8, 2007, Dr. Jeffrey Goodman, an orthopedic surgeon, consulted the claimant following an abnormal bone scan and MRI of the claimant's thoracic spine. Dr. Goodman reported probable osteomyelitis of T10 and T11 and directed a bone biopsy for a definitive diagnosis. (R. 190, 193). On August 10, 2007, Dr. Steven Ferzoco, a radiologist, examined a CT scan of the claimant's lumbar spine and noted no abnormality of T10 and T11. According to Dr. Ferzoco, "progressive and noticeable" improvements in the claimant's MRI scans made him "reluctant to immediately biopsy." (R. 255). The claimant's records do not reflect any further tests before her discharge on August 27, 2007.

The claimant returned to Eliza Coffee Memorial Hospital on September 14, 2007, complaining of abdominal pain and persistent nausea and vomiting. Dr. Morris ordered an abdominal ultrasound, chest x-ray, hepatobiliary scan, and CT scan of the claimant's abdomen and pelvis. All tests returned normal results. On Dr. Morris's order of an EGD, Dr. Haggstrom reported findings of esophagitis and gastritis, but identified no obstruction or ulcers. The claimant remained hospitalized until September 19, 2007, when Dr. Morris discharged the claimant with new prescriptions for a Duragesic patch, a pain reliever, and K-Dur, a potassium supplement. Dr. Morris directed the claimant to continue her existing regimen of medications, including Lortab and Ultram for pain, Phenergan for nausea, Restoril for insomnia, Xanax for anxiety, and Zantac for ulcer pain

and discomfort. (R. 325-26, 334-43).

On February 2, 2008, the claimant again presented to the emergency room at Eliza Coffee Memorial Hospital complaining of pain in her abdomen and right shoulder. Dr. Morris admitted the claimant and ordered a CT scan of her abdomen and pelvis, a CT scan of her head, and a whole body bone scan. Tests returned largely normal results, with the exception of a mild abnormality at the T11 vertebra and decreased air space in the right lung base. The claimant remained hospitalized until February 10, 2008, when Dr. Morris discharged the claimant with prescriptions for Duragesic patches and Percocet for pain, Trazadone for depression, Reglan for nausea, Neurontin for nerve pain, and Xanax for anxiety. (R. 507).

On April 1, 2008, the claimant met with Dr. Boyde Harrison, a primary care physician, at the direction of the Commissioner. The claimant reported overwhelming pain extending from her back into the left side of her chest, as well as severe insomnia. The claimant indicated that, to treat these symptoms, she took Neurontin, Percocet, and Xanax on a regular schedule. (R. 441). Following his examination of the claimant, Dr. Harrison reported that the claimant suffered from "a mild right shoulder bursitis" and an "[a]nxiety-related disorder." Dr. Harrison opined that the claimant's impairments were "not severe" and that she "could perform some work related activities." (R. 444-45).

Dr. Morris regularly consulted the claimant in his private practice from late 2007 through 2009. (R. 484-522). In his deposition, Dr. Morris testified that exclusive of his dozens of visits with the claimant while she was hospitalized, he saw the claimant fourteen different times at his private clinic. (R. 536). While records of these visits reflect complaints of pain radiating from varying points of origin, including the claimant's back, chest, and legs, they also indicate marked

7

improvement in the claimant's condition over time. (R. 485, 497, 499, 502). On April 9, 2009, the claimant reported that she was no longer taking any medications for her pain. (R. 485). Until that point, Dr. Morris consistently prescribed Percocet and Neurontin for pain, as well as Phenergan, Restoril, Xanax, and Zantac. (R. 497, 499, 502). On August 24, 2009, the claimant complained of increased anxiety, leg pain, and severe headaches. Dr. Morris reported that her symptoms were consistent with either restless leg syndrome or fibromyalgia, and he prescribed Cymbalta for depression. (R. 484).

On November 3, 2009, the claimant met with Dr. Alan Blotky, a psychologist, at the direction of her attorney. Following a range of tests, Dr. Blotky reported that the claimant has a Full Scale IQ of 75, which places her in the "[b]orderline range of intellectual abilities." Dr. Blotky also stated that the claimant "achieved a score of 22 on the Beck Depression Inventory, indicating the presence of moderate depression." *Id.* Dr. Blotky opined that the claimant requires psychiatric treatment for her depressive disorder and further medical care for her fibromyalgia. (R. 523-25).

*The Administrative Hearing*

After the Commissioner denied the claimant's application for supplemental security income, the claimant requested a hearing before an ALJ. (R. 74-75). At the hearing, the claimant testified that her pain, on a scale of one to ten, regularly ranges "anywhere between six and ten." (R. 41). According to the claimant, her aches and spasms "don't ever go away," and she estimated that she can drive for about an hour before having to stop. The claimant testified that, after an hour of sitting or driving, her "muscles start drawing," and she feels like something "pulls in [her] back." Referring to her previous jobs as a driver, the claimant stated: "I can't hold it out to drive like that anymore." (R. 31-33).

The claimant attributed her pain, as well as the paraspinal abscess from which the pain allegedly derives, to the accident she experienced while driving a four-wheeler in 2006. (R. 31). The ALJ clarified, however, that no physician has linked the abscess directly to injuries sustained in the accident. (R. 47). The claimant likewise testified that she believes her fibromyalgia arose as a result of complications following the accident and/or the abscess. The ALJ further clarified, though, that no physician has formally diagnosed the claimant with fibromyalgia. (R.34).

The claimant testified that she briefly returned to work at A.T. Construction from March to May of 2008, but noted that her pain limited her schedule to about ten hours of work per week. The claimant estimated that, on an average work day (between 8:00 and 5:00), she would have to spend at least four hours reclining. (R. 49).

The claimant confirmed that she was unemployed and that she lived with her mother. According to her testimony, the claimant woke up most days around 10:30 A.M. She ate, then spent most of the day prostrate before the television. She retired to bed around 9:00 P.M., but she slept poorly. (R. 46).

The claimant further confirmed that she no longer used any medication to alleviate her pain, but she regularly took a combination of Cymbalta, Clonopin, and Paxil, all for anxiety and depression. (R. 41). According to the claimant, her anxiety and depression had become as debilitating as her pain. (R. 50).

Thomas Elliot, a vocational expert, offered testimony on (1) the claimant's ability to return to previous work and (2) the type and availability of jobs the claimant could feasibly perform. The ALJ posed a hypothetical individual of the claimant's age, education, and background who is limited to a light range of work with required walking and standing for two hours out of an eight-hour day,

and she posited whether this hypothetical individual would be able to do any of the claimant's past work. According to Mr. Elliot, these limitations would preclude such an individual from engaging in any of the claimant's prior work. Mr. Elliot then qualified this response, noting that the hypothetical individual could possibly serve as an escort driver, as long as (1) entry to her vehicle required no climbing and (2) she was permitted to stop frequently to stretch her legs. (R. 56-57).

Mr. Elliot further testified that the hypothetical individual could perform the functions of any number of sedentary, unskilled jobs, including those of a surveillance system monitor, a final assembler, and a bench hand. According to Mr. Elliot, work at each of these jobs was available in both the regional and national economies. (R. 58-59).

The ALJ then narrowed the hypothetical, limiting the individual to simple routine tasks not performed in a fast-paced production environment. Mr. Elliot indicated that such an individual could perform the work of an escort driver (assuming the two qualifications above discussed), as well as the work of the three examples previously mentioned. Per Mr. Elliot, "[a]ll [of] those are considered routine, repetitive jobs." (R. 59).

The ALJ again narrowed the hypothetical, requiring for the individual ten percent of the workday off, in addition to regular breaks. Mr. Elliot indicated that this restriction would preclude all gainful employment. (R. 59-60).

Pat Nelson, the claimant's attorney, posed a hypothetical individual of the claimant's age, education, and background who regularly experiences moderately severe to severe pain more than two hours of the eight-hour work day, and he posited whether this hypothetical individual would be able to do any of the claimant's past work. According to Mr. Elliot, persistent pain at that level would preclude any of the claimant's past work, as well as any other gainful employment. (R. 60-61).

Mr. Nelson then modified the hypothetical, removing the persistent pain but requiring for the individual between two and four hours of the workday to lie down. According to Mr. Elliot, the need to rest for that period of time would also preclude any gainful employment. Mr. Nelson again modified the hypothetical, removing the need to lie down but adding a severe limitation in the individual's ability to react to customary and ordinary work pressures. Mr. Elliot concurred that this scenario, too, would preclude any gainful employment. (R. 61).

Mr. Nelson concluded the examination of Mr. Elliot, asking whether, based on the testimony he heard, the claimant could perform any of her past work or any other jobs in the nation's economy. Mr. Elliot thought not, assuming her testimony regarding pain and the need to lie down is corroborated by underlying medical evidence. (R. 60-61).

*The Administrative Decision*

On February 11, 2010, the ALJ issued a decision finding the claimant not disabled under Section 1614(a)(3)(A) of the Social Security Act. (R. 9). The ALJ's findings of fact and conclusions of law followed the five-step legal standard outlined in 20 C.F.R. §§ 404.1520, 416.920.

First, the ALJ found that the claimant had not engaged in any substantial gainful activity since the alleged onset of her disability. Next, the ALJ found that the claimant's back pain, fibromyalgia, depressive disorder, and anxiety disorder qualify as severe impairments. However, these impairments do not singly or in combination manifest the specific signs and diagnostic findings required by the Listing of Impairments. (R. 11-12).

Advancing to step four, the ALJ considered the claimant's subjective allegations of pain to determine whether the claimant maintained the residual functioning capacity to perform past relevant work. (R. 12). The ALJ concluded that "objective findings have failed to support her limitations,

as repeated and extensive diagnostic testing . . . did not show any residual problems that would account for her 'chronic pain.'" (R. 15).

In support of this conclusion, the ALJ authored an exhaustive time line of the claimant's relevant medical history, carefully noting that each major medical problem the claimant suffered was either resolved to a physician's satisfaction or followed by consistent improvement in the claimant's condition. Specifically, the ALJ emphasized that the claimant's physicians discharged her from the hospital in September 2007 with no recommendations for further surgery, despite previous worries of probable osteomyelitis in the T10 and T11 vertebrae. Likewise, when the claimant again visited Eliza Coffee Memorial Hospital in February 2008, her physicians administered an injection, noted her improvement, and discharged her promptly. (R. 13-15).

The ALJ summarized records of the claimant's regular follow-up visits with Dr. Morris, highlighting notes of improvement and the apparent resolution of her paraspinal abscess. The ALJ further stressed that no records reflect a formal diagnosis of fibromyalgia. On the contrary, following an office visit in April 2009, Dr. Morris merely noted "[l]eg pain and paresthesias, consistent with either restless leg syndrome or fibromyalgia." Per the ALJ, "this is the only evidence found that the claimant *might* have fibromyalgia." (R. 14) (emphasis added).

Regarding the claimant's psychological problems, the ALJ observed that multiple physicians had addressed the claimant's depression and anxiety through both consultation and medication. The ALJ identified no evidence, however, that the claimant "reported significant functional limitations or sought treatment from a mental health facility" as a result of her psychological condition. (R. 14-15).

The ALJ relied heavily on records from the wealth of physicians and psychologists who

treated and consulted the claimant, with specific emphasis on the records of Dr. Morris, the claimant's treating physician; Dr. Harrison, the state-appointed consulting physician; and Dr. Blotcky, the consulting psychologist retained by Mr. Nelson, the claimant's attorney. The ALJ expressly noted the diminished weight she assigned to the opinion of Dr. Blotcky, given his minimal contact with the claimant. The ALJ discussed the opinions of Dr. Morris more frequently than any other physician, but she expressly mitigated her evaluation of Dr. Morris's opinions, stating: "[W]hile Dr. Morris spoke of [the claimant's] level of pain, this is not his speciality area. He is a pulmonary specialist." As a result, the ALJ assigned an amplified weight to the analysis of Dr. Harrison, the consulting physician and a general practitioner, who diagnosed the claimant with "mild right shoulder bursitis" and opined that the claimant "could perform some work-related activities." (R. 15).

The ALJ ultimately concluded that the claimant would not be capable of performing past relevant work, but held that the claimant maintained "the residual functional capacity to perform sedentary work . . . with a sit/stand option and occasional walking and standing for 2 hours in an 8 hour day." (R. 12). Drawing on the testimony of Mr. Elliot, the vocational expert, the ALJ found that the claimant was capable of working as a surveillance system monitor, a final assembler, or a bench hand, all of which are adequately present and available in the national economy. (R. 15-16).

## VI. DISCUSSION

The claimant contends that the ALJ improperly disregarded the opinions of Dr. Felix Morris, her treating physician, in applying the Eleventh Circuit three-part pain standard. The court finds that the ALJ sufficiently qualified her evaluation of Dr. Morris's records and testimony in light of substantial contrary evidence. As such, the court further finds that the ALJ appropriately applied the

three-part pain standard.

The three-part pain standard applies when a claimant attempts to establish disability through his or her own testimony of pain or other subjective symptoms. *Holt v. Sullivan*, 921 F.2d 1219, 1223 (11th Cir. 1991). As noted above, the pain standard requires:

> (1) evidence of an underlying medical condition *and either*
> (2) objective medical evidence that confirms the severity of the alleged pain arising from that condition; *or*,
> (3) that the objectively determined medical condition is of such a severity that it can be reasonably expected to give rise to the alleged pain.

*Id.* (emphasis added). A claimant's subjective testimony, when supported by medical evidence that satisfies the pain standard, is sufficient to support a finding of disability. *Foote v. Chater*, 67 F.3d 1553, 1561 (11th Cir. 1995).

The claimant correctly notes that, in applying the pain standard and determining whether objective medical evidence supports the claimant's otherwise subjective testimony, the ALJ is compelled to give substantial weight to the opinion of the claimant's treating physician. *Crawford v. Comm'r*, 363 F.3d 1155, 1159 (11th Cir. 2004); *Lewis v. Callahan*, 125 F.3d 1436, 1440 (11th Cir. 1997). Likewise, the claimant correctly states that failure to articulate reasons for diminishing the weight given to the opinion of a treating physician constitutes reversible error. *Lewis*, 125 F.3d at 1440. Relying on these bright-line rules, the claimant accuses the ALJ of "cherry-picking" from the records and testimony of Dr. Morris to support the conclusion that the claimant's conditions have significantly improved. Further, the claimant contends that the ALJ assigned undue weight to the opinions of Dr. Harrison, a consulting physician, in concluding that the claimant is able to engage in *some* work.

While these arguments rest soundly on well-settled default rules, they ignore the equally well-

established *exceptions* to those rules. In *Crawford v. Commissioner*, the Eleventh Circuit addressed congruent arguments under markedly similar facts. 363 F.3d at 1158. In response, the Court plainly articulated that "the testimony of a treating physician must be given substantial or considerable weight *unless 'good cause' is shown to the contrary*." *Id.* at 1159 (quoting *Lewis*, 125 F.3d at 1440) (emphasis added). Courts have identified "good cause" to set aside the opinions of treating physicians when such opinions were "not bolstered by the evidence, or where the evidence supported a contrary finding." *Lewis*, 125 F.3d at 1440 (citing *Schnorr v. Bowen*, 816 F.2d 578, 582 (11th Cir. 1987)). Likewise, courts have found "good cause" when the treating physicians' opinions were "conclusory or inconsistent with their own medical records." *Id.* (citing *Edwards v. Sullivan*, 937 F.2d 580, 583 (11th Cir. 1991)).

In his deposition, Dr. Morris testified that the claimant would not be able to make it through a standard workday without having to lie down as needed. (R. 548-49). "The only way that she ... gets some relief," he stated, "is by taking the pressure off that back." (R. 549). In support of this conclusion, Dr. Morris cited the claimant's consistent complaints of leg pain behind the knees, as well as her treatment for, and recovery from, a paraspinal abscess. (R. 537-39). Dr. Morris admitted, however, that based on his surface-level examinations of the claimant, he was unable to formally diagnose any residual problems associated with the abscess. (R. 541). Further, Dr. Morris repeatedly emphasized that he is a pulmonary specialist, and he used anecdotes of his own experience with back pain to support his testimony as an expert. (R. 538-40, 541, 550).

The ALJ's opinion exhaustively recites the body of evidence contrary to Dr. Morris's testimony, including many citations to Dr. Morris's own records. (R. 13-15). Chiefly, the ALJ highlighted satisfactory resolution of all conditions requiring the claimant to be hospitalized. In July

2007, doctors drained the claimant's abscess, and in September 2007, doctors resolved her abdominal discomfort and persistent nausea and vomiting. (R. 13, 175-79, 325). Also in September 2007, extensive tests adequately dispelled suspicions of osteomylelitis in the T10 and T11 vertebrae, as well as any severe gastrointestinal problems. (R. 13, 255, 344). In February 2008, physicians treated complaints of chest and abdominal pain and again noted improvement upon her discharge. (R. 13, 418-40).

Records of the claimant's regular office visits with Dr. Morris reflect similar notes of improvement over time. As early as October 2007, Dr. Morris indicated that the claimant's paraspinal abscess had resolved. (R. 352). Despite continued complaints of pain in her back, abdomen, and joints, all examinations revealed more or less normal results. (R. 484-522). By April 2009, the claimant reported that she ceased to use any pain medications, and Dr. Morris again noted resolution of the abscess and improvement in her pain. (R. 485).

In short, Dr. Morris's deposition testimony regarding the claimant's debilitating limitations is not bolstered by the evidence and, in fact, is inconsistent with his own records. Dr. Harrison's diagnosis of a mild right shoulder bursitis, on the other hand, is consistent with the claimant's history of pain, as well her battery of normal test results and positive consultation reports. In light of the substantial evidence discussed above, this court finds that the ALJ acted with good cause in diminishing the weight afforded Dr. Morris's testimony. By extension, this court finds that substantial evidence adequately supported Dr. Harrison's conclusion that the claimant could perform *some* work-related activities.

Returning to the terms of the pain standard, thee ALJ correctly noted that the objective findings by Dr. Morris, Dr. Harrison, and many other physicians fail to support the claimant's

alleged limitations. This court, like the ALJ, acknowledges that the claimant suffered serious medical problems in 2007, lasting for many months and resulting in several stays in a hospital. The weight of the evidence, however, does not support a finding of any identifiable, sustained limitation that prevents all work activity. On the contrary, evidence of repeated and extensive diagnostic testing reveals no residual problems that account for her claims of chronic pain. Therefore, substantial evidence supports the ALJ's application of the pain standard, including the diminished weight accorded Dr. Morris's opinion.

## VII.  CONCLUSION

For the reasons stated, this court concludes that substantial evidence and good cause support the decision of the Commissioner and it is due to be AFFIRMED. The court will enter a separate order to that effect simultaneously.

DONE and ORDERED this 27th day of October, 2011.

_____
KARON OWEN BOWDRE
UNITED STATES DISTRICT JUDGE